[Cite as *State v. Howard*, 2017-Ohio-8742.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-226 |
| v. | : | (C.P.C. No. 15CR-5633) |
| Jeremiah R. Howard, Jr., | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 30, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie B. Swanson*, for appellee.

**On brief:** *The Law Office of Thomas F. Hayes, LLC,* and *Thomas F. Hayes*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Jeremiah R. Howard, Jr., appeals a judgment entered on March 17, 2016 sentencing him to serve five years in prison for conviction of one count of felonious assault following a jury trial. Howard argues that it was against the manifest weight of the evidence for the jury to find he failed to prove he acted in self-defense. While the jury heard much evidence that Howard acted in self-defense, we cannot say that it lost its way and created a manifest miscarriage of justice. Accordingly, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Though some aspects of the facts were disputed at trial, it is undisputed for purposes of this appeal that Howard shot Julius Rowe multiple times in a confrontation at 880 North Meadows Court, on October 11, 2015. On November 16, 2015, a Franklin County Grand Jury indicted Howard for two counts of felonious assault and one count of attempted murder, each with firearm specifications. (Nov. 16, 2015 Indictment.) One of the felonious

assault counts related to Rowe, the victim, and another related to Gary Watkins, who was with Rowe at the time. *Id.* Howard pled "not guilty" on November 18, 2015. (Nov. 18, 2015 Plea Form.) Trial commenced on February 16, 2016. (Tr., filed June 20, 2016 in six volumes.) The jury found Howard guilty of the count of felonious assault related to Rowe and the associated firearm specification but not guilty of the remaining offenses and specifications. (Feb. 22, 2016 Verdict Forms.)

{¶ 3} During the trial, seven employees of the Columbus Police Department (officers, detectives, and one civilian firearms examiner) testified on behalf of the State on a variety of topics including ballistics, crime scene procedure, evidence collection, and photo-lineup identification. Seven direct witnesses to the events underlying the charges also testified, including Rowe, Watkins, and Howard himself. The defense also called an expert to discuss the medical records of the victim, Rowe. Because what is solely at issue in this appeal is whether Howard acted in legally justifiable self-defense in shooting Rowe, we focus our discussion to the witnesses' testimony on that topic.

{¶ 4} The first witness to the shooting event who testified for the State was Roosevelt Jones, III, who lived at 880 North Meadows Court, Apartment A. (Tr. Vol. II at 183-85.) Jones testified that on October 11, he was playing dice with Howard and a few other people on the stoop of his residence. (Tr. Vol. II at 184-86.) He testified that a PT Cruiser[1] pulled up in front of his home and Rowe (who was very big) and another smaller guy (Watkins) got out of the car and speedily walked toward the stoop, shouting names at the people assembled there. (Tr. Vol. II at 187-89.) All of the dice players held up their hands and turned around trying to figure out to whom Rowe was talking. (Tr. Vol. II at 189.) Jones and Howard moved to the side and Rowe came toward them, making it clear that he was talking to one of them. (Tr. Vol. II at 190.) By the time it became clear that Rowe was shouting at Howard, Howard had backed up, with his hands up, almost to the wall of 880 North Meadows Court, near a bush. (Tr. Vol. II at 191-92.) Howard insisted he did not know Rowe but Rowe insisted that he did, that he had been looking for Howard, and he kept advancing toward him with his hands up as though intending to fight. (Tr. Vol. II at 192-93.) Meanwhile, Watkins, who was trailing Rowe, had his hands held behind his back in a way that suggested he might have had a gun. (Tr. Vol. II at 193.) Jones testified

---

[1] A five-door hatchback manufactured by Chrysler.

that he believed Watkins was armed.  (Tr. Vol. II at 215-16.)  He further testified that after Watkins fled in the wake of the shooting, he did not reappear for almost 20 minutes, which was plenty of time to hide a gun if he were carrying one.  (Tr. Vol. II at 216.)

{¶ 5}   After asking Rowe and Watkins to back off repeatedly, Howard drew his gun. (Tr. Vol. II at 193-94.)  Undeterred, Rowe taunted him saying he "like[d]" that Howard had drawn the gun and, "[i]f you have it, you better use it."  (Tr. Vol. II at 194.)  Howard told Rowe and Watkins that they had until the count of three to get away from him.  (Tr. Vol. II at 194-95.)  As he counted, they taunted and then rushed him again.  (Tr. Vol. II at 195.) Howard fired one shot into the ground, but when Rowe took another step forward Howard shot higher; Rowe grabbed his own face but did not fall down immediately so Howard kept firing.  (Tr. Vol. II at 195-97.)  On cross-examination, Jones explained the interaction as follows:

> Q.   I'm going to put yourself in Mr. Howard's position. If these two men had been coming at you, what would you have thought?
>
> A.   That they trying harm me, hurt me.
>
> Q.   Would you have been fearful for your life if you had been in his situation with two fellows coming, one with his hand behind his back, the other coming at you forcefully?
>
> A.   Yes, sir, I will be.
>
> Q.   Would you have thought your life was in jeopardy if you had been in his shoes?
>
> A.   Yes. But didn't know what they were coming towards me for. I don't know what was going on at the time. So they never once gave him a knowledge of knowing who -- what they were there for.
>
> Q.   If someone came at you at that time of day in that neighborhood, the way that they were coming at him and you had a gun, what would you do?
>
> A.   I would have shot first.
>
> [Prosecutor]: Objection.
>
> THE COURT: Overruled.

CONTINUING BY [Defense]:

Q. You would have what?

A. I would have shot first.

Q. Why?

A. Because how they came at me and in that neighborhood you don't want nobody running up on you like that, you don't --

Q. You think they are going to shoot you, your life's in jeopardy?

A. Yes, sir.

Q. You would reasonably have believed [Howard]'s life was in jeopardy if that had happened to you, what happened to Mr. Howard?

A. Yes.

Q. That night in that situation?

A. Yes. He be a better man than me, I wouldn't have talked first, I would have shot first.

Q. You wouldn't have given the warning one, two, three?

A. Nope, that's too much. They already had in their mind what they was going to do. So it was no talking back toward them.

(Tr. Vol. II at 206-08.)

{¶ 6} Elizabeth Stamper testified next for the State. (Tr. Vol. II at 219.) She testified that she lived with Jones at 880 North Meadows Court, Apartment A. *Id.* She stated that on the day in question, she saw Rowe jump from the PT Cruiser automobile before it even stopped and that he walked very quickly toward the group of men shooting dice on the stoop while yelling, "I'm looking for you." (Tr. Vol. II at 223-24.) The men on the stoop started to separate holding out their hands, uncertain to whom he was addressing, and Rowe focused first on Jones and Howard and then just Howard. (Tr. Vol. II at 224.) As Rowe advanced, taunting, hostile, and loud, Howard backed up repeatedly. (Tr. Vol. II at 225-27.) Stamper yelled from the window for everyone to come inside because she felt

the situation was "no good" and threatening.  (Tr. Vol. II at 240.)  Howard drew his gun and fired a shot into the ground whereupon Rowe simply became more agitated, saying he liked this and this was what he lived for.  (Tr. Vol. II at 227-28.)  Howard shot Rowe when he was approximately seven feet away but Rowe did not fall to the ground until approximately the third shot.  (Tr. Vol. II at 228-30.)  Stamper said Howard shot in the direction of Watkins also and that it appeared as if Watkins had a gun from the way he was holding his hands behind his back.  (Tr. Vol. II at 230-31, 233.)

{¶ 7}    The next witness to testify for the State was Lanija Sales, Rowe's girlfriend.  (Tr. Vol. II at 248.)  She testified that at approximately 8:00 p.m., she, Rowe, and Watkins drove to North Meadows Court so that Rowe could buy some marijuana.  (Tr. Vol. II at 248-50.)  After Rowe returned to the car from buying marijuana (apparently from another apartment located within 880 North Meadows Court), Sales began to drive away.  (Tr. Vol. II at 251-52.)  But Watkins told Rowe some people had been making rude comments about him and Rowe, becoming irate, Rowe told Sales to turn the car back.  (Tr. Vol. II at 251-52, 273-74.)  Sales had not heard any such comments (though she was in the car waiting with Watkins) and testified that Rowe was in a very aggressive mood, and she assumed he intended to fight someone.  (Tr. Vol. II at 273-75.)  However, as she put it, "I was kind of hesitant [to turn the car around], but I did it anyway just so we could get it over with and do what he was going to do and leave or whatever."  (Tr. Vol. II at 252.)

{¶ 8}    She testified that both Watkins and Rowe got out of the car and approached a young man (Howard) who was backing away from them.  (Tr. Vol. II at 253.)  Angry words were exchanged and Howard pulled out a gun.  (Tr. Vol. II at 254-55.)  She testified that Howard shot first between Rowe's legs, then into his face.  (Tr. Vol. II at 256.)  She testified that Rowe fell as soon as he was shot in the face and that once he was on the ground, Howard shot him several more times.  (Tr. Vol. II at 256-59.)  She testified that neither Rowe nor Watkins had a gun that night. (Tr. Vol. II at 261.)

{¶ 9}    Watkins testified next.  He explained that Rowe is his fiancée's brother and he regards Rowe as a brother.  (Tr. Vol. II at 290, 309-10.)  Watkins said that he and Sales stayed in the car while Rowe went to purchase marijuana.  (Tr. Vol. II at 291-92.)  He did not observe any interaction between Rowe and anyone in front of 880 North Meadows Court, and he did not know any of the five or six people shooting dice in front of the

apartment. (Tr. Vol. II at 293-94.) When Rowe returned to the car, Watkins told Rowe he heard people in front of the house talking about him, something about "cupcake dude." (Tr. Vol. II at 294-96.) Rowe became enraged and demanded that Sales turn the car around. *Id.* Rowe got out of the car and began moving fast toward the men on the stoop. (Tr. Vol. II at 311-12.) Watkins rushed to follow because he assumed he would be needed to support Rowe because Rowe was about to start some sort of confrontation. *Id.* When he caught up to Rowe, Rowe was arguing with Howard. (Tr. Vol. II at 296-97.) By the time Howard pulled the gun out, Rowe had backed Howard up to the bush near the wall of the apartment. (Tr. Vol. II at 298-300.) Howard counted down and fired one warning at their feet. (Tr. Vol. II at 300-01.) Watkins estimated that it was a couple seconds later that Howard fired again, this time striking Rowe in the face. *Id.* Watkins testified that Howard fired despite the fact that Watkins had grabbed Rowe and asked Howard not to shoot. *Id.* Watkins also said Howard fired at Rowe as Rowe lay on the ground but had difficulty explaining how he saw this since he also told detectives that when he ran from the shooting scene, he thought Rowe was running with him. (Tr. Vol. II at 301-03, 315-19.)

{¶ 10} The next witness to the shooting to testify on behalf of the State was Rowe himself. Rowe confirmed that he and the others came to 880 North Meadows Court to buy marijuana. (Tr. Vol. III at 388-89.) He explained that on the way to 880 North Meadows Court, he tried to say hello to a girl he knew and was repeatedly ignored. (Tr. Vol. III at 389-91.) Rowe said that as this went on, Howard turned to him and said, "[w]hat?" (Tr. Vol. III at 391.) Rowe testified that he ignored both Howard and the girl after that, went inside, bought marijuana, and returned to the car. (Tr. Vol. III at 391-93.) However, when he returned to the car, Watkins told him he heard somebody talking about him. (Tr. Vol. III at 394.) Rowe told Sales to turn the car around, assuming it had been Howard, in order to return and confront him. *Id.* When the trio arrived, Rowe, in his own words, "rushed out of the vehicle" and "rushed upon [Howard]. And I was like, what was you saying? And he was like, what? I was like, what was you saying? He was like, you ain't talking to me. I said, I'm talking to you. He said, no, you ain't. I said, yes, I am. So we get up in the grass, I'm thinking we like about to fight." (Tr. Vol. III at 395-96.) Rowe then explained:

> Q.      He moved over in the grass, what happens then?

> A. He pulled the gun out, I was screaming -- as he was saying something, I kept talking over him, I was, I like that. I like that. And he kept telling me to move and back up or something, something. And I just continued to yell at him. I was very hostile. I was very loud.
>
> And he like shot somewhere, I don't know where he shot, it didn't hit me, but, you know, after he shot, I was like, he just shot at me. Right then he shot again in the face. I instantly fell. Then after that I don't remember much, I just felt like pressure in my hip and my pelvis and other areas.
>
> Q. Okay. So you're saying first shot didn't hit you?
>
> A. Yes, sir.
>
> Q. About how much time was there between the first shot and the second shot?
>
> A. Like three seconds.

(Tr. Vol. III at 398.)  Although Rowe had difficulty hearing what Howard said because he was talking over him, Rowe did remember hearing Howard say "five, four" as if in a countdown.  (Tr. Vol. III at 426-27.)  Rowe also admitted he had a prior felony conviction for felonious assault and had served time in prison.  (Tr. Vol. III at 387.)

{¶ 11} The next direct witness to the shooting and the first witness called by the defense was Shawndale Moore, another resident of 880 North Meadows Court.  (Tr. Vol. IV at 543.)  He testified that on October 11, 2015 at around 9:00 p.m., he was outside with a group of 10 or at most 15 people shooting dice.  (Tr. Vol. IV at 543-44.)  A guy came by and went into a marijuana seller's apartment briefly before leaving.  (Tr. Vol. IV at 544.)  However, about two minutes later, the same car pulled back up at high speed and a big guy, about 250 or 275 pounds got out acting as if he wanted to fight.  (Tr. Vol. IV at 544-45.)  To Moore, Rowe appeared intoxicated and kept holding on to his pants as if he had a gun.  (Tr. Vol. IV at 546-48.)  During the interaction, Howard was continually backing up all the way to the wall of the house.  (Tr. Vol. IV at 549, 551.)  As Moore put it, "[h]e's backing up, like, he stops at a point, but he backed up to where he can't really back up no more."  (Tr. Vol. IV at 549.)  Moore also observed that the smaller man, Watkins, had his hands behind his back like he had a gun in order to provide back up to Rowe.  (Tr. Vol. IV at 550.)

{¶ 12} When Howard had backed up to the wall of the house, he pulled out a gun, warned Rowe and Watkins to back off, gave them a countdown, and fired a warning shot into the ground.  (Tr. Vol. IV at 551-52.)  When he did that, Rowe got even more aggressive and hyper, repeatedly saying, "I like that.  I like that."  (Tr. Vol. IV at 551.)  Only after that, did Howard shoot Rowe.  (Tr. Vol. IV at 551-52.)  To Moore's perception, it appeared Howard shot Rowe from a range of approximately two or three feet.  (Tr. Vol. IV at 553-54.)  Moore testified that he heard more shots but after the initial shot into Rowe, Moore was looking for cover and did not see where the rest were aimed.  (Tr. Vol. IV at 559-60.)  Moore agreed that the neighborhood of North Meadows Court is one in which most people carry guns.  (Tr. Vol. IV at 553.)

{¶ 13} The final witness in the case was Howard, testifying on his own behalf.  Howard testified that he is a high school graduate, worked at Kroger's, Wendy's, and Menards, and was trained as a mason.  (Tr. Vol. IV at 573-74.)  He acknowledged that North Meadows Court is a dangerous neighborhood and that most people there carry guns but explained that he was there because both his cousin and girlfriend lived there.  (Tr. Vol. IV at 575-76.)  At the time of the incident, he did not know either Rowe or Watkins though he did see Rowe go into and out of the marijuana seller's apartment.  (Tr. Vol. IV at 579-80.)

{¶ 14} Howard had his back turned when Rowe returned to North Meadows Court and came running up behind him, "really mad, [] mad as heck."  (Tr. Vol. IV at 580-81.)  Since Rowe was about 275 pounds and Howard was about 150 pounds, Howard backed up.  (Tr. Vol. IV at 581-82.)  As Howard put it:

> Q.  So he's significantly bigger than you?
>
> A.  For sure.
>
> Q.  Okay. So he runs up to you?
>
> A.  Yeah. Well, he's approaching me, he real mad, you know, I'm backing up because I'm for sure not going to let him punch me. He's too huge and I'm definitely not going to fight him.
>
> Q.  Is he bigger than you where if you were to have gotten in a fistfight, you --
>
> A.  Oh, yeah, I definitely would have lost.

Q.   Okay.

(Tr. Vol. IV at 582.)  Howard kept backing up, insisting he did not know Rowe.  (Tr. Vol. IV at 582-83.)  Rowe kept advancing insisting he knew Howard until he had backed Howard into the bush in front of the wall of the apartments.  (Tr. Vol. IV at 583.)

{¶ 15}  At that point in time, Watkins became visible to Howard from around a tree in the front lawn, Stamper yelled out the window of the apartment that everyone should get inside, and Howard panicked, thinking that Rowe was big enough to knock him out on his own and that the presence of another man suggested something more serious was in store.  (Tr. Vol. IV at 583-84.)  In addition, Rowe had backed him to a corner and Watkins was positioned strangely with his hands behind his back, as if preparing to offer some form of assistance to Rowe.  (Tr. Vol. IV at 585.)  Unnerved by Rowe's strange behavior, Howard drew his gun and told Rowe to back off and leave him alone.  (Tr. Vol. IV at 586-87.)  However, the presence of the gun seemed merely to inflame Rowe.  (Tr. Vol. IV at 587.)  He began to talk about how he "like[d] that," which made Howard more nervous still.  *Id.*  So when Rowe continued to approach, Howard shot into the ground.  *Id.*  However, even that did not halt or silence Rowe, and it seemed to Howard that Watkins was trying to creep around the side and hem him in.  (Tr. Vol. IV at 588.)  So, still unsure why Rowe was so aggressive even in the face of the gun, he told Rowe he would count to three.  (Tr. Vol. IV at 588-89.)  When the countdown finished, both Rowe and Watkins lunged, and he fired at Rowe.  (Tr. Vol. IV at 589-90.)  Rowe grabbed his face but did not fall, so he continued to fire.  *Id.*

{¶ 16}  Howard testified that he was in fear for his life.  (Tr. Vol. IV at 591.)  He was not sure if they were going to kill him, but the strange behavior made him suspect it was more than a simple fight that they wanted.  *Id.*  After Rowe fell, Howard's ears were ringing, he was not sure if anyone was still after him, but he ran.  (Tr. Vol. IV at 590-92.)  Howard testified that he never approached the police because he did not imagine that, given the circumstances of the shooting, Rowe would have reported the event to the police.  (Tr. Vol. IV at 594-95.)  Howard also explained that could not afford a lawyer with whom to approach the police regarding his defense.  (Tr. Vol. IV at 597-98.)

{¶ 17}  Forensic evidence and testimony presented at trial showed that Howard fired nine times.  (Tr. Vol. IV at 473; State's Ex. I.)  A witness who testified for the defense

regarding Rowe's medical records testified that one could not be certain from the records how many times Rowe was shot, but said he saw at least three wounds he would characterize as entrance wounds reflected in the records.  (Tr. Vol. IV at 518-19.)  The witness did note, however, that some records suggested Rowe might have been shot as many as five, seven, or ten times.  (Tr. Vol. IV at 523.)

{¶ 18}  The trial court instructed the jury on the affirmative defense of self-defense. (Tr. Vol. VI at 701-05.)  However, the jury returned a verdict of guilty on one count of felonious assault with Rowe as the victim and with a firearm specification.  (Feb. 22, 2016 Verdict Forms.)  Following a sentencing hearing on March 17, 2016, the trial court sentenced Howard to serve two years for the felonious assault count with a consecutive three years for the accompanying firearm specification for a total term of five years in prison.  (Mar. 17, 2016 Jgmt. Entry.)

{¶ 19}  Howard now appeals.

## II. ASSIGNMENT OF ERROR

{¶ 20}  Howard presents a single assignment of error for review:

> Mr. Howard's convictions on Count 1 (Felonious Assault of Julius Rowe) is contrary to the manifest weight of the evidence, as his defense of self-defense was established by the preponderance of evidence.

## III.  DISCUSSION

{¶ 21} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' "  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * *. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary* 1594 (6th Ed.1990).  In manifest weight analysis, "the appellate court sits as a 'thirteenth juror'

and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). We also note that, "[n]o judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." Ohio Constitution, Article IV, Section 3(B)(3); *Thompkins* at paragraph four of the syllabus.

{¶ 22} While the State bears the burden of proving the elements of a crime beyond a reasonable doubt, a defendant asserting the affirmative defense of self-defense must prove each element of the defense by a preponderance of the evidence. R.C. 2901.05(A); *State v. Martin*, 21 Ohio St.3d 91, 94 (1986). To establish self-defense, a defendant must prove: (1) he was not at fault in creating the situation giving rise to the affray, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape from such danger was the use of such force, and (3) he must not have violated any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. In defending oneself, consistent with the notion that force must be the only means of escape, a person may only use as much force as is reasonably necessary to repel the attack. *State v. Jones*, 10th Dist. No. 14AP-796, 2015-Ohio-2357, ¶ 27, citing *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 25; *see also State v. Williford*, 49 Ohio St.3d 247, 250 (1990); *State v. Thomas*, 77 Ohio St.3d 323, 329-30 (1997). "Deadly force," which Howard used in this case notwithstanding the fact that Rowe survived, "means any force that carries a substantial risk that it will proximately result in the death of any person." R.C. 2901.01(A)(2).

{¶ 23} The testimony in this case was universally to the effect that Rowe, not Howard, created the situation giving rise to the affray. *See supra*, at ¶ 4-16. Every witness to the shooting also testified that as Rowe advanced, Howard retreated. *See supra,* at ¶ 4-16. And many witnesses testified specifically that Howard retreated until it would have been difficult to retreat further. Jones testified that Howard had backed almost to the wall

near a bush by the time he drew his gun. (Tr. Vol. II at 191-92.) Watkins, the victim's friend, agreed that by the time Howard pulled the gun, Rowe had backed him up to a bush near the apartment wall. (Tr. Vol. II at 298-300.) Moore testified that during the interaction, Howard backed up all the way to the wall of the house. (Tr. Vol. IV at 549, 551-52.) As Moore put it, "[h]e's backing up, like, he stops at a point, but he backed up to where he can't really back up no more." (Tr. Vol. IV at 549.) And Howard, himself, testified that Rowe kept advancing until Howard had backed to "almost hit" a bush in front of the wall of the apartments. (Tr. Vol. IV at 583.) In our view, the evidence is such that any reasonable factfinder would have been compelled to conclude that Howard satisfied the first and third elements of his affirmative claim of self-defense.

{¶ 24} Thus, the only element upon which there was potential disagreement was whether Howard had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape was to use deadly force (in the form of multiple gunshots) because that was as much force as was reasonably necessary to repel the attack. *See Robbins* at paragraph two of the syllabus; *Jones* at ¶ 27; *Williford* at 250; *Thomas* at 329-30. In considering this inquiry, we keep in mind that it is generally true that "[w]ords alone do not justify the use of (deadly force) (force). Resort to such force is not justified by abusive language, verbal threats, or other words, no matter how provocative." *Ohio Jury Instructions*, CR Section 421.23 (Rev. Aug. 16, 2006); *State v. Nolen*, 10th Dist. No. 95APA05-569, 1995 WL 771437, 1995 Ohio App. LEXIS 5637, *9 (Dec. 19, 1995), citing *State v. Shane*, 63 Ohio St. 3d 630 (1992).

{¶ 25} It is undisputed from the evidence in the record that there was a great size disparity between the large and heavy Rowe and the much more slightly built Howard. *See, e.g.*, Tr. Vol. II at 188; Vol. IV at 545, 581-82. It was also undisputed, even from the testimony of Rowe, himself, that Rowe was very aggressive and intended to do physical harm to Howard. (Tr. Vol. III at 394-98.) Most witnesses testified that Watkins behaved as if he had a gun while positioning himself behind Rowe. *See, e.g.*, Tr. Vol. II at 193, 206-07, 233; Vol. IV at 550, 585, 590. It is also undisputed (even by Rowe, himself) that after Howard drew his gun, warned Rowe verbally, and fired a warning shot, Rowe continued, undeterred, to menace Howard. *See, e.g.*, Tr. at Vol. II at 193-97, 206-08, 226-30, 300-01; Vol. III at 398; Vol. IV at 551-52. Thus, we do not find it difficult to conclude that Howard

was entitled to a bona fide belief that he was in imminent danger of death or great bodily harm.  Nor do we doubt that, *at least initially*, he was justified in shooting Rowe.  That is, if Rowe was undeterred by the presence of the gun, a countdown, and the firing of a warning shot, it seems only reasonable to conclude that shooting him was "as much force as [was] reasonably necessary to repel the [imminent] attack." *Jones* at ¶ 27.  But, Howard fired eight times after the warning shot, striking Rowe at least two or three times and possibly more.  (Tr. Vol. IV at 473, 518-19, 523; State's Ex. I.)  And witness testimony differed as to whether Rowe fell after being hit for the first time.  *Compare* Tr. Vol. II at 195-97, 229-30; Vol. IV at 589-90 *with* Tr. Vol. II at 261, 301-03, 315-19; Vol. III at 398.  A reasonable jury could have inferred that eight shots were more than was reasonably necessary to repel the attack, and, hence, Howard's only means of escape from the danger was not the use of that much force because lesser force (firing fewer times) would have sufficed.  *See Robbins* at paragraph two of the syllabus; *Jones* at ¶ 27; *Williford* at 250; *Thomas* at 329-30.

{¶ 26} Although this is a close case, we do not find that " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *Martin* at 175.  Howard's sole assignment of error is overruled.

## IV.  CONCLUSION

{¶ 27} In our view upon a manifest weight analysis, Howard did establish that he was not at fault in creating the situation giving rise to the affray, that he had a bona fide belief that he was in imminent danger of death or great bodily harm, and that he did not violate any duty to retreat or avoid the danger.  Howard also established that at least, ab initio, he was justified in the use of deadly force as necessary to repel the threat posed by the persistent aggression of Rowe and Watkins even in the face of threatened deadly force.  However, we think a reasonable jury could have concluded that Howard continued firing after Rowe fell and after the threat ended.  Thus, a reasonable jury could have concluded that Howard's use of force went beyond what was reasonably necessary to repel the attack.  Accordingly, we cannot find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Judgment affirmed.*

KLATT and LUPER SCHUSTER, JJ., concur.

_____