[Cite as *State v. Davis*, 2020-Ohio-4202.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 19AP-521<br>(C.P.C. No. 18CR-2951) |
| Roussilon Davis, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 25, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee.

**On brief:** *Erb Leis Grant LLC*, and *Anastasia L. Erb*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Roussilon Davis, appeals a conviction for felonious assault entered by the Franklin County Court of Common Pleas on August 3, 2019 following a "guilty" verdict from a jury. Because the evidence at trial showed that Davis stabbed an unarmed woman during a fight in her workplace, we conclude that Davis's conviction for felonious assault was sufficiently supported and not against the manifest weight of the evidence, that the trial judge did not err in refusing to instruct the jury on non-deadly force self-defense, and that her trial attorney was not ineffective where, consistent with Davis's wish not to be convicted of any non-sealable felony, he declined to seek an instruction on a potential compromise offense of aggravated assault. We therefore overrule her four assignments of error and affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}    On June 19, 2018, a Franklin County Grand Jury indicted Davis for felonious assault.  (June 19, 2018 Indictment.)  She pled "not guilty" on July 5.  (July 5, 2018 Plea Form.)  The following year, beginning in early June, a jury trial was held.

{¶ 3}    At the outset of the trial, the parties discussed the plea negotiations that had occurred.  (Tr. at 4-7.)[1]  The prosecution had offered to permit Davis to plead to aggravated assault, an inferior degree felony, but Davis indicated she would reject a plea to any non-sealable felony.  (Tr. at 4-5.)  Consistent with this preference (to avoid conviction for any non-sealable felony), Davis's counsel did not ask for an instruction on aggravated assault and the inferior degree offense was not presented to the jury as a possible finding.  (Tr. at 205.)  During the presentation of evidence, three witnesses testified: Katrela Averett (the victim with whom Davis fought), Officer Danny Amabile (who responded to the scene), and Davis herself.

{¶ 4}    Officer Amabile testified that, on May 9, 2018, he was called to a warehouse on Spiegel Drive regarding a fight.  (Tr. at 80.)  When he arrived, the two combatants, both women, were separated.  (Tr. at 82.)  One (Davis) was in an office.  *Id.*  The other (Averett) was on the floor.  *Id.*  Amabile saw a significant amount of blood (which he documented in photographs) but no injuries that needed his immediate attention.  (Tr. at 82, 84-99.)  While medics began treating Averett for a "large" laceration, he went to the office to interview Davis.  (Tr. at 87, 91-92.)  Davis, who had a cut above her eye and scrapes on her hands and fingers  (Tr. at 92), handwrote the following account of the events that day:

> I was on my way to Break.  Coming up Row 7.  A lift in front of me Stop and started talking So I Blew Horn To let Them know I was behind Them so They could move.  The girl look Back at Me and Turn Back around and continued on Talking.  So I said girl you got a problem, and I don't know what it is but you Need to get out my way.  Then she started yealling shouting I am saying whatever just move out my way.  So then she started moving slowly talking shit.  So then she say you can met me outside I said I dont have to meet you outside am right here.  She is on a stand up and am on a sit down.  She gets off her lift.  Walking to me so I gets down off my lift.  The next thing I know is am on the ground cause this Crazy Broad had the Nerves to Hit me.  The first hit knocks me on the ground and she keep

---

[1] The transcript was filed in two consecutively paginated volumes on September 17, 2019 and is cited herein by page number only.

Hitting my in my Head. I am crawling on the ground trying to get up and she still is Hitting me in my head. Something Click and I said you have that knife in your Pocket. I reach in my Pocket. got it in I Stabe her in her leg. So she can let go of my Head. I remember people trying to pull me up from the ground. People had her telling her to stop and the next thing I remember is mark and Andra talking to me trying to get me to focus on them and go to office. She started Screaming She Stab me. yah let her up in Here with a knife. So can you believe that you Beat my face in and you talking about I stab you. But. I never ever pulled out that knife until after I got Punched about 6 7 times on the ground crawling to get up. to get her off me.

(Sic passim.) (State's Ex. B; Tr. at 102-06.)

{¶ 5} Officer Amabile testified that he recovered a small paring knife with a black handle from the scene. (Tr. at 101.) He did not ask Averett for a written statement and none was introduced at trial. (Tr. at 109.) He agreed that none of the injuries sustained by either woman appeared to be life-threatening. (Tr. at 93.) But he also agreed that there was a lot of blood, so much that it could have come from more than one person. (Tr. at 111.)

{¶ 6} The other witness for the prosecution was Katrela Averett. Averett testified that she was working at the warehouse through a temporary agency and, though she had six years of experience as a forklift driver, she had only worked at that location for approximately three weeks. (Tr. at 36-37.) She said that, at the time of the fight, she had known Davis for approximately one and one-half weeks. (Tr. at 38.) Davis was also a driver but they worked in different departments in the warehouse. (Tr. at 38-40.) She said that in the short period of time in which she knew Davis prior to the fight, she had negative interactions with Davis. (Tr. at 41-42.) She stated that she did not have a problem with Davis, but Davis seemed to have a problem with her. *Id.*

{¶ 7} On May 9th, she said she was trying to stay busy between times when the system designated orders for her to fill by riding around the warehouse cleaning. (Tr. at 44.) Each time she ran into Davis, Davis would "try to make it known." *Id.* On each such occasion, Averett would go to a different section of the warehouse to get away from Davis. (Tr. at 44-45.) Eventually she decided to ask a supervisor for permission to go home because the system kept crashing and Davis was making her feel uncomfortable. (Tr. at 45-46.) As she was talking to a coworker in an aisle attempting to locate a supervisor, Davis approached from behind, blowing her horn, yelling things, and telling her she had to move.

(Tr. at 46-47.) She drove to the next aisle and Davis followed, persistently provoking her with vulgar and disrespectful language. (Tr. at 47-48.)

{¶ 8} She said she pulled to the side and both she and Davis got off their lifts (with Davis being the first to step down from her lift). (Tr. at 48-50.) She said Davis approached and yelled things in her face. *Id.* She responded by offering to take the dispute outside. *Id.* Averett claimed that she felt this invitation to go outside indicated a willingness to fight but also an unwillingness to fight right then and there. (Tr. at 75.) Whatever Averett's subjective belief about what she meant, Davis responded that she did not want to go outside and was ready to do it here. (Tr. at 49.) She alleged that following those remarks, Davis pushed her and, at that point, Averett hit her. (Tr. at 49-50.) Initially, Averett said she hit Davis once, causing her to fall, and that Davis pulled out the knife and stabbed Averett in the back of the knee as she started to walk away. (Tr. at 50-51.) She also alleged that, after the first stab, Davis rose to her feet and attempted to stab her further. (Tr. at 51.)

{¶ 9} However, Averett later stated that, after Davis fell to the first hit, Averett hit her more—what she initially estimated to be a total of approximately four times. (Tr. at 58.) She eventually admitted that she had, in fact, continued to hit Davis while Davis was on the ground and was not sure how many times she hit Davis. (Tr. at 68, 70-71.) Even after the clarification that she hit Davis several times while Davis was on the ground, Averett held to her statement that Davis had stabbed her while she was stepping away from the affray. (Tr. at 68-69, 72.)

{¶ 10} Davis was the only other witness to testify and the only witness to testify for the defense. She said she had been a factory worker her whole life and had worked for the company running the warehouse for approximately five years. (Tr. at 129-30.) She said that at the time of the incident she had recently returned to work after a leave of absence taken in consequence of a rotator cuff injury and the death of her father. (Tr. at 130-33.) When she returned to work, there were a number of temporary workers at the warehouse, one of whom was Averett. *Id.* She stated that the first interaction she had with Averett consisted of Averett looking at her funny and each asking the other if she had a problem. (Tr. at 133-34.) Davis said she laughed at Averett, informed her that she didn't have a problem with her, and that Averett was "not a factor" as far as she was concerned. (Tr. at 133-34, 169-70.) The next interaction between the two involved a dispute over the right-of-

way rules within the warehouse. (Tr. at 134-39.) Averett refused to make way for Davis and Davis was compelled to fetch a supervisor to resolve the issue. *Id.* The next interaction was the fight on May 9, 2018. (Tr. at 139.)

{¶ 11} On that day, as every day, Davis left her house at 4:30 a.m. and rode two different busses to arrive at work by the start of her shift at 7:00 a.m. (Tr. at 139-40.) Because it was always dark when she left and returned from work, because she was female, and because she was (in her own characterization) "old," Davis carried a knife with her for protection. (Tr. at 141.) On May 9, the busses were later than usual and she only arrived barely on time, with no opportunity to go to her locker to stow the knife before clocking in to start her shift. (Tr. at 142-43.) After she finished her duties for the morning, she was headed to lunch when she came up behind Averett who was stopped in an aisle talking to someone. (Tr. at 143-45.) She tooted her horn. (Tr. at 145-47.) Averett looked at her and then went back to her conversation without moving. (Tr. at 145-47.) When she told Averett to move, Averett called her an "old bitch." (Tr. at 147-48.) Nevertheless, Averett moved slightly and Davis attempted to squeeze by but struck a pallet causing damage visible in State's Exhibit 54. (Tr. at 148-50.) After she hit the pallet, she stopped and Averett got off her lift. (Tr. at 151-52.) Seeing Averett dismount and approach her threatening to "fuck her up," Davis dismounted also. (Tr. at 152, 179-80.)

{¶ 12} The fellow with whom Averett had been conversing attempted to intervene and tell Averett to leave Davis alone. (Tr. at 152-54.) Averett, however, disregarded the attempted intervention and instead invited Davis to step outside. (Tr. at 154-55.) Davis said she responded by telling Averett that she could do whatever she was going to do right then and there, but made that statement believing that Averett would not do anything to her inside or outside. (Tr. at 154-55.) She later quoted herself as having said, "you're not going to do nothing. I'm right here. You're not going to do nothing to me outside and you're not going to do nothing to me inside." (Tr. at 180.) Averett responded to that declaration by punching her in the eye, which cut her brow and knocked her to the ground. (Tr. at 155-56, 180-81.) She denied pushing or touching Averett in any way before the punch. (Tr. at 155.)

{¶ 13} After the punch and Davis was on the ground, Averett continued to punch Davis in the face. (Tr. at 155-56.) Davis tried to rise but only made it to her knees because

her boots were sliding on the warehouse floor and could not see properly with blood running down her face. (Tr. at 155-57.) According to her testimony, during this time she felt something in her pocket and, without thinking what it was, pulled it out and stabbed Averett. (Tr. at 158-59.) Averett did not let go of her or cease punching until the stabbing. (Tr. at 159.) Davis said she only stabbed one time to end the fight. *Id.* She said she felt she had no choice but to lash out with whatever her hand closed on in her pocket, whether that was a pen, a pencil, or (as it turned out) a knife, because she felt her life was in danger due to the repeated blows to her head. (Tr. at 165-66.) She said she would not have sought a fight due to her age and rotator cuff problems on her dominant side. (Tr. at 164.) She had not anticipated Averett fighting "[w]hatever [she] said to her." *Id.* She had rather expected respect from Averett because she was her elder. *Id.*

{¶ 14} At the close of trial, the defense asked for an instruction on non-deadly self-defense. (Tr. at 199-204.) That instruction would have eliminated the duty to retreat from the otherwise customary instruction on deadly-force self-defense. *Id.* The trial court declined to give the non-deadly instruction and instead gave an instruction on self-defense where the defending person employs deadly force. (Tr. at 203-04, 261-63.) The trial court supported its decision on this jury instruction by declaring the defendant's testimony about the fear she was in and the fact that she used a knife in her defense were together more consistent with a deadly force scenario. (Tr. at 203-04.) The jury returned a verdict of "guilty" on the sole charge of felonious assault. (Tr. at 273-75.)

{¶ 15} The trial court sentenced Davis to three years of community control with conditions, including 60 days of house arrest, and two jail terms: from November 27, 2019 to December 1, 2019 and December 24, 2019 to December 27, 2019. (Aug. 3, 2019 Jgmt. Entry; Aug. 2, 2019 Sentencing Tr. at 7-8, filed Sept. 17, 2019.) Davis now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Davis assigns four errors for our review:

> [1.] THE TRIAL COURT'S FINDING OF GUILTY TO THE FELONIOUS ASSAULT IN VIOLATION OF [R.C.] 2903.11 IS AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE.
>
> [2.] THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL BECAUSE THE EVIDENCE PRESENTED

BY THE STATE WAS INSUFFICIENT TO SUPPORT A CONVICTION OF FELONIOUS ASSUALT [sic] BY MEANS OF A DEADLY WEAPON.

[3.]   THE TRIAL COURT ERRED WHEN IT DID NOT INSTRUCT THE JURY ON SELF-DEFENSE RELEVANT TO NON-DEADLY FORCE.

[4.]   DEFENDANT WAS EFFECTIVELY DENIED HER CONSTITUTIONAL RIGHT TO ASSISTANCE OF COUNSEL FOR COUNSEL'S FAILURE TO REQUEST AN AGGRAVATED ASSAULT INSTRUCTION.

## III.  DISCUSSION

### A. First and Second Assignments of Error – Whether Davis's Conviction was Against the Manifest Weight of the Evidence and Whether it was Insufficiently Supported such that a Criminal Rule 29 Motion should have been Granted

{¶ 17} In her first assignment of error, Davis argues that her conviction was insufficiently supported by the evidence at trial and against the manifest weight of the evidence. (Davis's Brief at 4-11.)  Davis also argues, in her second assignment of error, that the trial court should have granted a motion under Ohio Criminal Rule 29, dismissing the case for insufficient evidence.  *Id.* at 12-13.  Although there are differences in the standards of analysis, because these inquiries overlap in significant ways, we find it efficient to address them together.

{¶ 18} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary* 1594 (6th Ed.1990).  In manifest weight analysis, "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388,

quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 19} In contrast, sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's* at 1433. "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 20} "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995); *Thompkins* at 386. Thus, we address Davis's arguments regarding the Crim.R. 29 motion using the same standard we use for sufficiency.

{¶ 21} The Ohio Revised Code defines felonious assault as follows:

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another * * *;

(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon* * *.

R.C. 2903.11(A). " 'Deadly weapon' means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). " 'Physical harm to persons' means any

injury, illness, or other physiological impairment, regardless of its gravity or duration."
R.C. 2901.01(A)(3).

> (5) "Serious physical harm to persons" means any of the following:
>
> * * *
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶ 22} There is no dispute that Davis used a knife to stab Averett with the result that she caused her at least "physical harm," with the potential that it could also be characterized as "serious physical harm." *Compare* R.C. 2901.01(A)(3) *with* 2901.01(A)(5). The evidence at trial was not developed with a great deal of specificity on the extent of the harm suffered by Averett. There were no medical records or pictures of the injury and Averett's testimony regarding the injury was quite general and approximate regarding the size of the wound and the quantity of sutures required to close it. (Tr. at 52-53.) Thus, from the standpoint of R.C. 2903.11(A)(1), whether the stabbing injury Averett took was "serious physical harm" is less than clear from the record.

{¶ 23} Regardless, Davis testified that she carried the knife for self-defense purposes due to the dangerousness of her neighborhood and the fact that she commuted to and from work by public transit in the dark. (Tr. at 141.) In other words, it is clear that the knife was a "deadly weapon" because it was capable (by its nature as a knife) of inflicting death and was, in this case, "possessed, carried, or used as a weapon." R.C. 2923.11(A). Because the knife was a deadly weapon and because Davis indisputably stabbed Averett with it, there is

no other conclusion we can draw than that Davis caused physical harm to Averett by means of a deadly weapon under (A)(2) of R.C. 2903.11.

{¶ 24} Though Davis's trial testimony suggests that she unconsciously lashed out and may not have "knowingly" stabbed Everett, her written statement given on the scene suggests differently. *Compare* Tr. at 158-59, 165-66 *with* State's Ex. B at 2. In that statement, she relates, "Something Click and I said you have that Knife in your Pocket. I reach in my Pocket. got it in I Stabe her in Her leg." (Sic passim.) (State's Ex. B at 2.) Leaving aside for a moment the issue of self-defense, the evidence in the record supports the finding that Davis committed felonious assault when she knowingly inflicted physical harm on Averett with a deadly weapon. R.C. 2903.11(A)(2).

{¶ 25} Nevertheless, the issue of self-defense is part of our review. Both we and the Supreme Court have previously explained that the elements of self-defense in a deadly-force case are that the defendant (1) was not at fault in creating the situation giving rise to the affray, (2) that the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and his or her only means of escape from such danger was the use of such force, and (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus; *State v. Howard*, 10th Dist. No. 16AP-226, 2017-Ohio-8742, ¶ 22. Consistent with force being the only means of escape, a person may only use as much force as is reasonably necessary to repel the attack. *Howard* at ¶ 22, citing *State v. Jones*, 10th Dist. No. 14AP-796, 2015-Ohio-2357, ¶ 27; *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 25; *State v. Williford*, 49 Ohio St.3d 247, 250 (1990); *State v. Thomas*, 77 Ohio St.3d 323, 329-30 (1997).

{¶ 26} In the past, the elements of self-defense were for the defendant to establish by a preponderance of the evidence. *See, e.g.*, *State v. Martin*, 21 Ohio St.3d 91, 94 (1986). But revisions to the law enacted shortly before the incident in this case occurred, have placed the burden on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt. R.C. 2901.05(B)(1); 2019 Am.Sub.H.B. No. 228.[2] That is, R.C. 2901.05(B)(1) provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person

---

[2] Archived online at 2017 Ohio HB 228.

> who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

In other words, in this case the prosecution was required to disprove self-defense by proving beyond a reasonable doubt that Davis (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that she was in imminent danger of death or great bodily harm for which the use of deadly force was her only means of escape, OR (3) did violate a duty to retreat or avoid the danger. *See* R.C. 2901.05(B)(1); *Robbins* at 74, paragraph two of the syllabus.

{¶ 27} On a sufficiency of evidence review, putting Davis's testimony at face value, alongside Averett's testimony and, based on our requirement to construe evidence on a sufficiency challenge in favor of the State, Davis was partially at fault in creating the altercation between her and Averett. Nor did she retreat from it. Davis could have chosen a different aisle to travel once Averett showed a reluctance to move, rather than antagonizing her. She could have driven away rather than step down from her forklift when Averett got off of hers. She could have responded to Averett's suggestion that they take the fight outside by refusing to fight altogether rather than taunting Averett with the assertion, "you're not going to do nothing. I'm right here. You're not going to do nothing to me outside and you're not going to do nothing to me inside." (Tr. at 180.) Moreover, if Averett's version of events is credited rather than Davis's, Davis stabbed Averett as she was retreating from the fight. (Tr. at 50-51, 68-69.) If true, that fact would demonstrate that the deadly force employed by Davis was not necessary to escape the danger because the danger had already passed at the time it was employed. Thus, "viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found" that the prosecution disproved at least one of the "essential elements" of self-defense "beyond a reasonable doubt." (Citations and quotation marks omitted.) *Monroe*, 2005-Ohio-2282, ¶ 47.

{¶ 28} We turn to that portion of Davis's first assignment of error that the jury's verdict was against the manifest weight of the evidence. Having reviewed the entire record, weighed the evidence, made all reasonable inferences, considering the credibility of

witnesses and determining " 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered,' " we cannot find the jury's verdict to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.

{¶ 29} While there was evidence in this case from which the jury could have found self-defense, we do not find that the jury clearly lost its way in declining to excuse Davis's conduct on grounds of self-defense. *Thompkins* at 387. We overrule Davis's first and second assignments of error.

## B. Third Assignment of Error – Whether the Trial Court Erred in Refusing to Instruct the Jury on Non-Deadly Self-Defense

{¶ 30} " 'As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged.' " *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, ¶ 17, quoting *State v. Adams*, 62 Ohio St.2d 151, 153 (1980). As a result of changes to R.C. 2901.05, in self-defense cases the prosecution must also disprove self-defense. 2019 Am.Sub.H.B. No. 228. As we discussed above, in deadly-force cases, self-defense consists of three elements, any one of which the prosecution may disprove in order to carry its burden to disprove self-defense. *See supra* at ¶ 25-26. These are that the defendant (1) was not at fault in creating the situation giving rise to the affray, (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape from such danger was the use of such force, and (3) did not violate any duty to retreat or avoid the danger. *Robbins*, 58 Ohio St.2d at 74, paragraph two of the syllabus.

{¶ 31} When deadly force is used in self-defense there exists a duty to retreat before exercising that deadly force. Conversely, in cases where deadly force is not used in self-defense, there is no duty to retreat. *Ettayem v. Safaryan*, 10th Dist. No. 13AP-988, 2014-Ohio-4170, ¶ 37. And the defendant does not have to have a bona fide belief that he or she was in imminent danger of death or great bodily harm; rather, mere "garden-variety" harm will suffice. *State v. Luc Tan Vu*, 10th Dist. No. 09AP-606, 2010-Ohio-4019, ¶ 10. In such cases, the prosecution does not disprove self-defense if it proves only that the defendant failed to retreat or that the defendant was not faced with an imminent risk of death or great bodily harm.

{¶ 32} Davis argues that the evidence at trial showed that the force she employed in this case (stabbing Averett in the leg with a small paring knife) did not constitute deadly force. (Davis's Brief at 14-15.) Consequently, Davis urges us to find that the trial court should have instructed the jury on non-deadly self-defense, thereby depriving the prosecution of the opportunity to argue that she failed to retreat or that she was not faced with an imminent threat of death or great bodily harm. We decline.

{¶ 33} " 'Deadly force' means any force that carries a substantial risk that it will proximately result in the death of any person." R.C. 2901.01(A)(2). Taking that definition at face value, it is conceivable that, in the right circumstance, stabbing a large enough leg with a small enough knife might create essentially no proximate risk of death to that person. And this case could be viewed as such an instance. (Tr. at 101; State's Ex. P5.) However, caselaw supports that even use of a small knife on another person is generally considered deadly force. *State v. Brown*, 5th Dist. No. 2018CA00107, 2019-Ohio-2187, ¶ 50 (collecting cases). Against that legal backdrop, the defense did not present any medical evidence to distinguish this situation. Nor did the defense show that there was actually no substantial risk to Averett's life by the force used here. In fact, Averett testified that, after the first stab, Davis rose to her feet and attempted to stab her further. (Tr. at 51.) Under such circumstances, we do not find that it was error for the trial judge to have refused to give the non-deadly-force self-defense instruction.

{¶ 34} We overrule Davis's third assignment of error.

**C. Fourth Assignment of Error – Whether Trial Counsel was Constitutionally Ineffective in Failing to Request Instruction on the Inferior-Degree Offense of Aggravated Assault**

{¶ 35} We have previously explained the relationship between aggravated assault and felonious assault:

> Aggravated assault is defined in relevant part as follows:
>
> (A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:
>
> (1) Cause serious physical harm to another.

> R.C. 2903.12(A)(1). In most cases, aggravated assault would be felonious assault, but for the additional mitigating element that the offense was committed "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." *Compare* R.C. 2903.11(A)(1) *with* R.C. 2903.12(A)(1). Thus, while it involves an intervening cause of serious provocation and is not specifically a lesser-included offense of felonious assault, it has been considered to be an "inferior degree" of felonious assault. *State v. Deem*, 40 Ohio St.3d 205, 208, 533 N.E.2d 294 (1988), paragraph four of the syllabus.

*State v. Porter*, 10th Dist. No. 19AP-29, 2019-Ohio-4868, ¶ 21, quoting R.C. 2903.12(A)(1).

{¶ 36} The evidence in this case is such that, had aggravated assault been presented to the jury as an option, that could have been the result of the trial. For example, punching Davis in the face and then punching her while she was on the ground could have been found to have constituted a serious provocation by Averett sufficient to incite Davis to using deadly force for aggravated assault, an inferior-degree offense of felonious assault. Davis asserts that the failure to pursue this avenue to lessen her culpability constituted ineffective assistance by her trial attorney. (Davis's Brief at 16-18.)

{¶ 37} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. "In evaluating counsel's performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 37, quoting *Strickland* at 689; *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). To show that a defendant has been prejudiced by counsel's deficient performance, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694; *see also State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 42, quoting *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 38} The Supreme Court of Ohio has consistently held that "defendant's counsel's decision not to request an instruction on lesser included offenses—seeking acquittal rather than inviting conviction on a lesser offense—was a matter of trial strategy." *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, ¶ 30, citing *State v. Clayton*, 62 Ohio St.2d 45 (1980). That is, defense counsel may, in the course of valid strategic reasoning, conclude that his or her client has a better chance of outright acquittal if the jury is only offered a choice between conviction or acquittal of the charged offense rather than allowing the jury to also consider a compromise option of an inferior degree offense. Moreover, the record in this case shows that Davis was offered a deal to plead to aggravated assault at the outset of trial and refused it because she would accept no offer that involved a non-sealable felony. (Tr. at 4-5.) Davis expressed on the record her preference to take her chances at trial rather than plead to aggravated assault. This actually supports the conclusion, based on the presumption that defense counsel's conduct falls within the wide range of reasonable professional assistance. We conclude that defense counsel's decisions on jury instructions were sound trial strategy when declining to offer the jury the compromise option of aggravated assault. (Tr. at 205.)

{¶ 39} We overrule Davis's fourth assignment of error.

## IV. CONCLUSION

{¶ 40} Davis's conviction for felonious assault was sufficiently supported and not against the manifest weight of the evidence where she stabbed an unarmed woman during the course of a fight. The trial judge did not err in refusing to instruct the jury on non-deadly force self-defense where Davis employed a knife. Her trial attorney was not ineffective where, consistent with Davis's wish not to be convicted of any non-sealable felony, he declined to seek an instruction on a potential compromise offense of aggravated assault, an inferior degree felony. We therefore overrule Davis's four assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER, J., concurs.
NELSON, J., concurs in judgment only.

_____