**[Cite as *State v. Irvin*, 2020-Ohio-4847.]**

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28495 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-3623 |
| | : | |
| LANCE A. IRVIN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of October, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Lance A. Irvin appeals from his conviction for murder and tampering with evidence. For the reasons that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} In the early morning hours of November 14, 2017, Jesse Redavide, Savanna DelGrosso, Eric Stone, and Lauryn Clark went to the home of Jesse's older brother, Joseph Redavide.[1] At some point, Irvin also arrived at Joseph's home. Following an altercation, Irvin shot Jesse. Dayton police officers and emergency medical technicians were dispatched to the home. Jesse was declared dead at the scene.

{¶ 3} In April 2018, Irvin was indicted on two counts of murder (proximate cause) in violation of R.C. 2903.02(B), one count of felonious assault (serious harm) in violation of R.C. 2903.11(A)(1), one count of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2), and one count of tampering with evidence (alter/destroy) in violation of R.C. 2921.12(A)(1). The counts of murder and felonious assault each carried an attendant three-year firearm specification. Irvin filed a motion to suppress statements he made to the police, which was denied by the trial court.

{¶ 4} A jury trial began in April 2019. DelGrosso testified that she and Jesse were engaged and that she was several months pregnant at the time of the shooting. She testified that she, Jesse, Stone, and Clark decided to go to Joseph's house after their late work shift. When they arrived, they began to watch a movie. DelGrosso testified that everyone, except her, had been drinking and smoking pot. DelGrosso testified that Stone fell asleep on the couch.

---

[1] For the sake of clarity, we will refer to the Redavide brothers by their first names.

{¶ 5} At some point, DelGrosso heard the front door open, and she observed Irvin enter the home. She heard Irvin and Jesse talking loudly and heard them get into a "scuffle." Tr. p. 376. DelGrosso heard Jesse ask Irvin to put him down, and then Irvin laughed. She also heard Irvin say, "you hurt my – I hit my head." Tr. p. 381. Irvin then said "I'm going to mark everybody in this house. I hit my head. My head is hurt." According to DelGrosso, "mark" means kill.

{¶ 6} DelGrosso testified she heard the door slam and tires squeal. A short time later, she heard a knock on the door. She then heard Irvin's voice and saw him walk in with a gun in his hand. Jesse said, "Please don't," but Irvin pointed the gun at Jesse and shot him.

{¶ 7} Clark testified that Irvin entered the home and began to argue with Jesse before Joseph broke them apart. She testified that Irvin stated that his head was hurt, he had guns, and he was going to "kill everybody." Tr. p. 454. When Irvin left, Clark closed and locked the front door; Irvin returned about 15 to 20 minutes later. Irvin knocked on the door and Joseph let him in. Clark testified that Irvin pulled out a gun, at which point Jesse raised his hands and said, "I'm sorry." She testified that Irvin then shot Jesse.

{¶ 8} Joseph testified that he and Irvin knew each other and "used to hang out all the time." Tr. p. 499. Joseph testified that Irvin showed up at his home unannounced on the day of the shooting; Irvin knocked on the front door, and Joseph allowed him to enter. According to Joseph, Jesse and Irvin approached each other and were being friendly when they got into "a little shoving match about a foot into my house. They both went down. I split them up, threw [Irvin] out, threw my brother on the couch." Tr. p. 501.

**{¶ 9}** Joseph testified Irvin came back a short time later and knocked on the front door. Someone opened the door, and Irvin came in and began complaining about a knot on his head and saying, "look what you did." Tr. p. 507. Joseph saw Irvin pull a gun and point it at Jesse. He testified Jesse began apologizing while backing up with his hands up. Joseph testified that Irvin shot Jesse and then fled the scene.

**{¶ 10}** Testifying on his own behalf, Irvin testified he knew Joseph as the "neighborhood dealer, weed dealer." Tr. p. 856. He further testified that, for the year prior to the shooting, he had gone to Joseph's home "every other day," and they used marijuana and liquid THC. Tr. p. 858. According to Irvin, he got off work around 12:30 a.m. on the morning of the shooting. He testified he was driving from work when another friend, Tenia Lane-Calhoun, called him seeking a ride from work. Irvin picked up Lane-Calhoun, they made some stops, and then they drove to Joseph's home. Irvin testified that Lane-Calhoun waited in the car while Irvin went into the home to get some food and drugs. Irvin testified that Jesse met him just inside the front door, and Irvin could smell alcohol on Jesse's breath. Irvin testified that Jesse yelled, "Joey, your n****r friend is at the door." Tr. p. 866. Irvin testified he asked Jesse why he would say that and Jesse replied, "I don't care about n*****s." *Id.* Irvin claimed Jesse then attacked and "monkey dunked" him.[2] After Irvin fell to the floor, Jesse grabbed a rifle and hit Irvin in the head. Irvin testified that he feared for his life and thought Jesse would kill him, so he pulled out his own gun, shot Jesse, and then fled the premises. He testified that his gun only had two bullets, and he discharged the second bullet into the floorboard of his Durango SUV.

---

[2] From Irvin's subsequent explanation, "monkey dunk" appears to mean to tackle a person's legs and knock them down.

Irvin testified that, as he drove from the scene, he threw the gun into bushes located on Linden Avenue. Irvin testified he thought he parked the vehicle at a relative's home, but he was actually at the wrong home; when he realized his mistake, he had to leave the Durango at the home because the vehicle was out of gas. Irvin testified he and Lane-Calhoun then walked to his stepmother's home, where Irvin spent the night. Irvin was arrested later in the day.

{¶ 11} Lane-Calhoun testified that, on November 14, 2017, Irvin picked her up in a Durango and took her to her mother's home, where she picked up some belongings. Irvin then took her to his sister's home. Lane-Calhoun testified that Irvin left her at his sister's home while he went out. When Irvin returned, he had a knot on his head and he stated he had been hit in the head with a gun. Lane-Calhoun testified that she and Irvin then went to Irvin's stepmother's home. Lane-Calhoun testified that, sometime before dawn, Irvin left in the Durango and then returned on foot. She testified that she did not go to Joseph's home.

{¶ 12} Other evidence at trial established that Joseph owned a .22 caliber rifle, which was found under his bed, recovered by the police, and swabbed for DNA. Neither Jesse's nor Irvin's DNA was found on the swab. Additionally, the police collected a spent .40 caliber shell casing just outside the front door of Joseph's home. Irvin's SUV was discovered by a homeowner on Sylvan Drive, who contacted the police to report that the SUV was blocking her garage. The police recovered a .40 caliber bullet from the SUV's floorboard.

{¶ 13} The evidence established that Jesse died from a gunshot wound to his left chest. The evidence also demonstrated that Irvin was approximately six inches to two

feet from Jesse when he shot him. Finally, the evidence established the bullet passed downward approximately four inches through Jesse's upper chest, left lung and aorta before exiting his back.

{¶ 14} The jury found Irvin guilty of all charges. The trial court held a sentencing hearing in May 2019, at which it merged the counts of murder and felonious assault; the State elected to proceed to sentencing on one of the murder counts. The trial court imposed a prison term of 15 years to life on the murder conviction, plus a three-year consecutive prison term on the firearm specification. The trial court also imposed a 30 month consecutive term for tampering with evidence. The aggregate prison term was 20 years and six months to life. The trial court also informed Irvin that the murder conviction was a qualifying violent offender offense under R.C. 2903.41 and, as a result, he would be required to register as a violent offender.

{¶ 15} Irvin filed a timely notice of appeal.


## II. Self-defense Instruction

{¶ 16} Irvin's first assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT FAILED TO PROPERLY INSTRUCT THE JURY ON THE LAW OF SELF DEFENSE.

{¶ 17} At Irvin's request, the trial court instructed the jury on the issue of self-defense. But, over Irvin's objection, the self-defense instruction did not reflect the changes to Ohio's self-defense statute (R.C. 2901.05) made by Am.Sub.H.B. 228 ("H.B. 228").

{¶ 18} Prior to the enactment of H.B. 228, self-defense was an affirmative defense

which the defendant was required to prove by a preponderance of the evidence. *State v. Davis*, 10th Dist. Franklin No. 19AP521, 2020-Ohio-4202, ¶ 26. H.B. 228, which was enacted on December 27, 2018 and became effective on March 28, 2019, shifted the burden of proof to the State. Now the statute provides that when self-defense is at issue, "the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be." *Id.*

{¶ 19} The question here is whether the trial court erred by not giving a self-defense jury instruction consistent with the changes to H.B. 228. This is a legal issue that we review de novo. *State v. Kormos*, 2012-Ohio-3128, 974 N.E.2d 725, ¶ 13 (12th Dist.).

{¶ 20} Irvin asserts that the following statutory language compels the conclusion that he was entitled to the benefit of the H.B. 228 changes:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, *at the trial* of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

(Emphasis added.) R.C. 2901.05(B)(1).

{¶ 21} Irvin contends the "at the trial of a person" language required the conclusion

that H.B. 228 was applicable to any trial conducted after March 28, 2019. Thus, by Irvin's reckoning, he was entitled to the benefit of H.B. 228 even though Jesse's death occurred before March 28, 2019. We disagree.

{¶ 22} The Twelfth and Fifth Appellate Districts have interpreted the meaning of the "at the trial of a person" language and have reached different conclusions. In *State v. Gloff*, 2020-Ohio-3143, __ N.E.3d __ (12th Dist.), the Twelfth District concluded as follows:

> The H.B. 228 amendment applies prospectively to *trials*. The pertinent amendment does not concern the conduct giving rise to the offense but relates to the applicable burden of proof for the affirmative defense of self-defense. Under the new amendment, if self-defense evidence is presented at trial, the prosecution must then prove, beyond a reasonable doubt, that the defendant did not use the force in self-defense.

(Emphasis sic.) *Id.* at ¶ 23. In *State v. Lewis*, 2020-Ohio-3762, __ N.E.3d __ (12th Dist.), the Twelfth District reaffirmed the *Gloff* decision, holding that "the burden shifting changes made by the legislature to Ohio's self-defense statute, R.C. 2901.05, through the passage of H.B. 228, appl[y] to all trials that were held, or will be held, on or after the effective date of the statute, March 28, 2019. This holds true regardless of * * * when the [offense] may have occurred." *Lewis* at ¶ 26.

{¶ 23} In contrast, in *State v. Brooks*, 2020-Ohio-4123, __ N.E.3d __ (5th Dist.), the Fifth District interpreted the "at the trial of a person" phrase as follows:

> This court has * * * reviewed the language of the amended statute and we

do not agree with the Twelfth District Court of Appeal[s'] interpretation of the language of the statute. We do not find the "at the trial of a person" language to be a directive regarding the applicability of the statute, rather, it is a reference as to the time and place the * * * evidence must be presented that tends to support that the accused person used the force in self-defense.

*Id.* at ¶ 42. The opinion concludes that Brooks "was not entitled to the burden-shifting changes as [H.B 228] does not apply retroactively to offenses that occurred prior to the statute's effective date." *Id.* at ¶ 43.

{¶ 24} We agree with the Fifth District's analysis regarding the import of the "at the trial of a person" language. The language only reflects that the H.B. 228 changes, whenever effective, are applicable to trials at which "there is evidence presented that tends to support that the [defendant] used * * * force in self-defense * * *." R.C. 2901.05(B)(1). The language simply does not address whether application of H.B. 228 is required at a trial involving an offense occurring before March 28, 2019 but coming to trial on or after that date.

{¶ 25} As such, the question's resolution turns on application of the test to determine whether a statute has retroactive application. A statute, unless "expressly made retroactive[,]" has prospective application. R.C. 1.48. *See also Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 105, 522 N.E.2d 489 (1988). This rule, in conjunction with the Ohio Constitution's (Section 28, Article II) proscription against retroactive laws, prompted the Ohio Supreme Court "[to] establish[ ] a two-part test to determine whether a statute may be applied retroactively." *Brooks* at ¶ 32, citing *State*

*v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163, 871 N.E.3d 1167, ¶ 10.   The first part of the test, which is dispositive in this case, is a determination "whether the General Assembly expressly intended the statute to apply retroactively[.]"   *Id.* at ¶ 33, citing *State v. Hubbard*, 2020-Ohio-856, 146 N.E.3d 593, ¶ 22 (12th Dist.).   If there is not an express intention of retroactive application, the analysis ends and the statute has prospective application.[3]   *Id.*

**{¶ 26}** The General Assembly has not expressly indicated, through H.B. 228's language or otherwise, an intent that H.B. 228 have retroactive application to offenses committed before March 28, 2019.   *Lewis* at ¶ 37.   Thus, H.B. 228's change to the burden of proof is not applicable to an alleged crime that occurred before March 28, 2019 but which came to trial on or after March 28, 2019.   As such, Irvin was not entitled to the benefit of H.B. 228's burden-shifting modification.[4]

**{¶ 27}** Irvin's first assignment of error is overruled.

### III.    Violent Offender Database

**{¶ 28}** The second assignment of error asserted by Irvin states:

THE TRIAL COURT ERRED WHEN IT FOUND THAT LANCE IRVIN WAS

A VIOLENT OFFENDER.

---

[3] Assuming an express intention of retroactive application, the second part of the test requires a determination whether the statute is remedial or substantive.   If remedial, retroactive application is permitted.   *State v. White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, ¶ 27.

[4] We reached a similar conclusion in *State v. Koch*, 2019-Ohio-4099, 146 N.E.3d 1238 (2d Dist.).   But Koch's trial occurred before March 28, 2019.

{¶ 29} Irvin claims the Violent Offender Database ("VOD") enacted by S.B. 231 is unconstitutional because it is violative of the prohibition against cruel and unusual punishment. He thus asserts the trial court erred by finding him a violent offender subject to enrollment in the VOD.

{¶ 30} In enacting S.B. 231, known as Sierah's Law, the General Assembly established a statewide Violent Offender Database along with a legal presumption that offenders convicted of certain violent crimes must enroll therein for a period of 10 years following their release from prison. See R.C. 2903.41 through R.C. 2903.43. As pertinent hereto, R.C. 2903.41(A) defines a "violent offender" to include, among others, any person convicted of murder in violation of R.C. 2903.02.

{¶ 31} Irvin contends that the duty to enroll created by Sierah's Law constitutes cruel and unusual punishment because it is an additional penalty to his prison sentence. We disagree.

{¶ 32} Classification as a violent offender and enrollment into the VOD are akin to designation as a sexual offender and the registration duties attendant thereto, as both are "a collateral consequence of the offender's criminal acts rather than a form of punishment per se." *Hubbard*, 2020-Ohio-856, 146 N.E.3d 593, ¶ 32 (12th Dist.), citing *State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, ¶ 34. *See also State v. Caldwell*, 2014-Ohio-3566, 18 N.E.3d 467, ¶ 30-35 (finding that classification as an arson-offender and registration in the arson-offender registry was a collateral consequence of committing an arson offense). Instead, these designations and the required enrollment/registration constitute a "remedial, regulatory scheme designed to protect the public rather than punish the offender." *Ferguson* at ¶ 34.

{¶ 33} As pointed out by the Twelfth District Court of Appeals in *Hubbard*, the requirements for violent offenders are even less onerous than those for sex offenders. First, the court noted that a sex offender cannot challenge his or her classification, while a violent offender may present evidence to rebut the presumption of enrollment. *Id.* at ¶ 34. Next, a violent offender need not register as often as a sex offender. *Hubbard* at ¶ 35. And, while a sex offender may have to register in multiple counties, a violent offender need register only in his or her county of residence. *Id.* Further, sex offenders have residence restrictions that are not applicable to violent offenders. *Id.* The Ohio Supreme Court has ruled that the sex offender designation and registration scheme does not constitute cruel and unusual punishment. *See State v. Blankenship*, 145 Ohio St.3d 221, 2015-Ohio-4624, 48 N.E.3d 516. Based upon this conclusion, we find that the S.B. 231 registration requirement does not constitute cruel and unusual punishment.

{¶ 34} Irvin's second assignment of error is overruled.

### IV.     Manifest Weight of the Evidence

{¶ 35} Irvin's third assignment of error states:

THE MURDER AND FELONIOUS ASSAULT CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

{¶ 36} Irvin asserts his convictions were not supported by the evidence because his testimony established he acted in self-defense.

{¶ 37} In a challenge based on the weight of the evidence, an appellate court considers not only the quantity of the evidence, but the quality of the evidence as well. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. Accordingly, an

appellate court's manifest weight review requires the court to "review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8. A jury's verdict "should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Hill* at ¶ 8, quoting *Martin* at 175.

{¶ 38} In a situation involving death or great bodily harm, a defendant is not entitled to a finding of self-defense if (1) the defendant was at fault in creating the situation giving rise to the affray, (2) the defendant did not have a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force, or (3) the defendant violated any duty to retreat or avoid the danger. *State v. Gillespie*, 172 Ohio App.3d 304, 2007-Ohio-3439, 874 N.E.2d 870, ¶ 12 (2d Dist.), citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979). These elements are cumulative, and if the defendant fails to prove any of the elements by a preponderance of the evidence, the claim that he acted in self-defense necessarily fails. *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990), citing *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986).

{¶ 39} Irvin does not challenge the jury's conclusion that the State proved all of the elements of the charged offenses. Rather, as previously stated, his argument is premised upon his claim that he established the affirmative defense of self-defense.

Essentially, he argues the jury lost its way by failing to credit his testimony.

{¶ 40} "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 41} Irvin's argument ignores the fact that the State presented the testimony of three eyewitnesses, all of whom testified that Irvin left Joseph's home after the initial struggle with Jesse. Joseph, DelGrosso and Clark testified Irvin then returned and walked into the house with a gun. Their testimony indicates that Jesse had his hands up in the air and was backing away from Irvin when Irvin shot him. This testimony, which the jury was free to credit over that of Irvin, negated Irvin's self-defense claim.

{¶ 42} Upon review, we do not agree that the jury clearly lost its way in choosing to believe the testimony of Joseph, DelGrosso and Clark and to disbelieve the testimony presented by Irvin. A trier of fact is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Wright*, 8th Dist. Cuyahoga No. 80555, 2002-Ohio-4279, ¶ 25.

{¶ 43} The third assignment of error is overruled.


## V.    Motion to Suppress

{¶ 44} For his fourth assignment of error, Irvin asserts the following:

THE TRIAL COURT ERRED WHEN IT OVERRULED THE MOTION TO SUPPRESS EVIDENCE.

**{¶ 45}** Appellate "review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. An "appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). Accepting "these facts as true, the appellate court must then independently determine, without deference to the [legal] conclusion[s] of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (3d Dist.1997).

**{¶ 46}** Irvin claims that, despite the assertion of his right to counsel, the police subjected him to custodial interrogation concerning the injury to his head, and the State later used his answers against him at trial. We disagree.

**{¶ 47}** There is no dispute that Irvin, after he was in custody and had been apprised of his *Miranda* rights, asserted his right to counsel. Thereafter, he indicated he had a head injury. Detective David House was informed of Irvin's claim and he asked Irvin questions to determine whether the injury was sustained before or after he was taken into custody. House asked Irvin what was wrong with his head, to which Irvin replied that he had been hit with a rifle during the altercation. House asked him what was wrong with his head, and Irvin indicated he was having "blurred vision" and might have a concussion. Suppression Tr. p. 110. House noted the incident had occurred 12 hours earlier, and Irvin responded he had fallen asleep. House asked Irvin where his head was injured; Irvin indicated a spot on his forehead and then stated "I fell back and the gun did what it

did." At that point, House directed an officer to transport Irvin to a local hospital for an examination.

{¶ 48} House later instructed Dayton Police Department Sergeant Jeffrey Spires to conduct an investigation to document whether the injury had occurred prior to or after Irvin's arrest. According to Spires, he initially met Irvin in the emergency room at Grandview Hospital, and Spires informed Irvin he was there only to investigate the injury to Irvin's head. He testified Irvin informed him the injury occurred when he was hit in the head with a rifle. Spires then asked whether the injury had been caused by the Dayton Police. Irvin answered negatively and went on to state that he had been in an argument. At that point, Spires informed Irvin that he did not want to know about the altercation. Spires then informed Irvin that he needed to take pictures to document the injury. While Spires was photographing the injury, Irvin began to cry and stated, "I don't know what happened. The gun just went off. I ruined my life." Suppression Tr. p. 142.

{¶ 49} After a suspect invokes his *Miranda* rights, custodial interrogation is prohibited. *Miranda v. Arizona*, 384 U.S. 436, 473-474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Coleman*, 2018-Ohio-4043, 121 N.E.3d 91, ¶ 13 (2d Dist.). Custodial interrogation occurs when an officer, by words or action, seeks information from a suspect that he knows is reasonably likely to be incriminating. *Rhode Island v. Innis*, 446 U.S. 291, 300-301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. Thompson-Shabazz*, 2017-Ohio-7434, 96 N.E.3d 1146, ¶ 17 (2d Dist.).

{¶ 50} The suppression hearing testimony established that the Dayton Police Department (DPD) has a policy outlining the procedure to be used to investigate and document an injury to a person in police custody. The record reflects that House and

Spires, consistent with the policy, limited their questions to the circumstances surrounding Irvin's claimed head injury.

**{¶ 51}** We conclude the trial court's suppression decision was correct. The inquiries at issue were prompted by Irvin's injury complaint. Given this, the questioning was required by the DPD policy. House and Spires confined their questions to the circumstances of the claimed injury. Thus, the questions were not designed to elicit, or were not reasonably likely to elicit, an incriminating response from Irvin. As such, Irvin was not subjected to custodial interrogation after his invocation of his right to counsel.

**{¶ 52}** The fourth assignment of error is overruled.


## VI. Conclusion

**{¶ 53}** All of Irvin's assignments of error being overruled, the judgment of the trial court is affirmed.

## VII. Certification of a Conflict

**{¶ 54}** Because we recognize that our judgment is in conflict with the Twelfth District's holdings in *Gloff*, 2020-Ohio-3143, __ N.E.3d __ (12th Dist.) and *Lewis*, 12th Dist. Butler No. CA2019-07-128, 2020-Ohio-3762, we sua sponte certify a conflict to the Supreme Court of Ohio pursuant to Article IV, Section 3(B)(4), Ohio Constitution. The certified question is:

> Do the burden-shifting changes made to the self-defense statute, R.C. 2901.05, through the passage of H.B. 228 apply to offenses that were committed before the effective date of the statute but tried after the effective date?

**{¶ 55}** We note that our sua sponte decision to certify a conflict does not relieve the parties of the obligation to follow all Supreme Court procedural rules governing the filing of an appeal of right. We also direct the parties to S.Ct.Prac.R. 8.01, which requires "an interested party to the proceeding" to file a notice of the certified conflict in the Supreme Court.

. . . . . . . . . . . .

HALL, J., concurs.

FROELICH, J., dissents:

**{¶ 56}** I agree with the Twelfth District's interpretation of the applicability of H.B. 228 and therefore dissent. I concur with all other aspects of the opinion of the majority.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Robert Alan Brenner
Hon. Michael W. Krumholtz