[Cite as *State v. Dixon*, 2022-Ohio-3157.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-29 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-242 |
| | : | |
| TALICIA A. DIXON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of September, 2022.

. . . . . . . . . . .

MEGAN A. HAMMOND, Atty. Reg. No. 0097714, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Suite 200, Xenia, Ohio 45385
        Attorney for Plaintiff-Appellee

L. PATRICK MULLIGAN, Atty. Reg. No. 0011618 and FRANK MATTHEW BATZ, Atty. Reg. No. 0093817, 28 North Wilkinson Street, Dayton, Ohio 45402
        Attorneys for Defendant-Appellant

. . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Talicia A. Dixon appeals from her conviction following a jury trial on one count of murder with a firearm specification.[1]

{¶ 2} Dixon advances five assignments of error. She contends the trial court erred in refusing to instruct the jury on the inferior-degree offenses of aggravated assault and voluntary manslaughter. She claims the trial court failed to give a "correct and complete" intervening-cause instruction as it related to the victim's death. She also contests the trial court's failure to apply Ohio's recently-enacted "stand-your-ground" law. Finally, she challenges the legal sufficiency and manifest weight of the evidence to convict her.

{¶ 3} We conclude that the evidence did not warrant an aggravated-assault or voluntary-manslaughter instruction, that the trial court's intervening-cause instruction was adequate, and that Ohio's new stand-your-ground law did not apply retroactively to Dixon's case. We also find legally sufficient evidence to support her conviction, which was not against the weight of the evidence. Accordingly, the trial court's judgment will be affirmed.

## I. Background

{¶ 4} The present appeal stems from a shooting outside of a residence on the night of May 4, 2018. On that date, Dixon shot Andre Nooks in the neck, rendering him a quadriplegic. Nooks died at a long-term care facility in January 2019 following complications from the gunshot. Dixon does not dispute shooting Nooks. The only real issues at trial were whether she acted in self-defense and whether the treatment Nooks received at the long-term care facility was an intervening cause of his death.

---

[1] The jury also found Dixon guilty of felonious assault with a firearm specification, which was subject to merger as an allied offense of similar import.

{¶ 5} The record reflects that Dixon and two friends, Kendra Lane and Dwight Jamison, went to the Round Table bar in Xenia on the night in question. While there, Dixon encountered another group of people that included Vanessa Hoyt, Andre Nooks, Christian Weems, and others. Dixon and Weems argued in the bar, and the dispute later became physical in the parking lot. Hoyt testified that Dixon and Weems "attacked each other." According to Hoyt, the two women pulled hair and scuffled for about a minute before being separated. For her part, Dixon testified that Hoyt and Weems jointly assaulted her in the parking lot. Dixon explained that she retreated to the safety of her car after being punched in the face by both women. Police arrived and spoke to members of both groups, but no arrests were made.

{¶ 6} Following the parking-lot incident, the two groups parted ways. Dixon's friend Natasha Erkins drove her to Kendra Lane's house at 467 Franklin Avenue in Xenia. While Dixon was there, Lane called and argued with members of Hoyt's group, including Hoyt, Weems, and Nooks. Following the call, Hoyt's group decided to go to Lane's house. Hoyt's group arrived at Lane's residence in two cars. Hoyt testified that upon arriving she saw Dixon "running towards the street." Hoyt instructed Nooks, who was driving her car, to park down the street in front of 314 Franklin Avenue so Dixon wouldn't harm her vehicle. The second car in Hoyt's group parked directly in front of Hoyt's vehicle.

{¶ 7} Hoyt testified that Nooks exited her car and began walking toward Lane's house. Hoyt then saw Lane throw a bottle at Nooks while walking toward him. Hoyt began following Nooks as he walked toward Lane's house. Hoyt retrieved the bottle and tossed it aside. As Hoyt was walking, she saw Dixon run to Natasha Erkins' car, which was

parked in Lane's driveway, and retrieve something from the back seat. Shortly thereafter, Hoyt was standing near Nooks and speaking to Erkins when she heard Lane say, "Talicia, what the f**k?" Hoyt turned and saw Dixon pointing a handgun, pulling the slide back, and ejecting rounds onto the ground. Hoyt then heard a "boom," and Nooks fell to the ground with a gunshot wound in his neck. Hoyt testified that Nooks had not physically assaulted Dixon, "lunged" at her, or made any threatening comments prior to being shot. Hoyt stated that she and Nooks were at the end of a neighbor's driveway near Lane's house when the shooting occurred. Dixon fled the scene after the shooting. Police arrived and found Nooks in the street outside 481 Franklin Avenue. Shell casings from the firearm were found in Lane's yard at 467 Franklin Avenue.

{¶ 8} Neighbor Vicki Cromwell, who resided at 434 Franklin Avenue, testified that prior to the shooting she heard loud voices and went outside to see what was occurring. She saw a lady retrieve something from a car parked in Lane's driveway. Cromwell then watched this person walk up to a small group of people, raise her arm, and fire a gunshot. Cromwell did not see anyone physically assault the shooter prior to the gunshot.

{¶ 9} For her part, Dixon testified that she was outside with Lane when the cars carrying Hoyt's friends arrived. Dixon stated that they were honking and yelling at her, and she feared that she would be assaulted again. After the cars parked, Hoyt and Nooks began walking toward her and Lane. Dixon testified that she tried to hold Lane back and stop her from confronting Hoyt and Nooks. According to Dixon, she retrieved the handgun from Erkins' car only after Hoyt threw a bottle at her and Lane. Dixon claimed she did not know the firearm was loaded. She "pulled it back" to scare Hoyt. She also asked the

members of Hoyt's group to leave. Dixon testified that Nooks then "lunged" toward her. At that point, Dixon feared for her life and was afraid that she was going to be beaten. She raised her arm and fired the gun. Dixon reiterated that she was afraid and believed there was no way to avoid being beaten when she shot Nooks. On cross-examination, Dixon explained that she fired the gun "out of fear of [Nooks] coming towards [her]."

{¶ 10} Weems and Lane, who was Dixon's cousin, also testified as defense witnesses. Weems testified that she and Hoyt did hit Dixon in the bar parking lot. Weems stated that the plan was to go to Lane's house to fight Dixon after leaving the bar. Upon arriving at Lane's residence, Weems testified that she saw Hoyt and Nooks directly in front of Dixon screaming at her.

{¶ 11} On cross-examination, Weems admitting being good friends with Dixon. She also admitted telling police after the incident (1) that Dixon had been the aggressor outside the bar, (2) that Weems had defended herself outside the bar, (3) that only Weems and Dixon were involved in the altercation outside the bar, (4) that no one in Hoyt's group went to Lane's house with the intent to fight Dixon, (5) that Hoyt and Nooks went to Lane's house to talk to Dixon, (6) that Dixon ran after the car Weems occupied outside of Lane's house, and (7) that Weems did not see the shooting or what happened at the time of the shooting.

{¶ 12} Lane testified that she was outside her house with Dixon when Hoyt and Nooks drove down her street honking their horn, cursing, and making threats. According to Lane, Hoyt and Nooks parked and then began approaching on foot. As they did so, Hoyt threw a bottle toward Lane and Dixon. Lane testified that she responded by trying

to push Dixon back toward her house as Dixon tried to restrain her from confronting Hoyt. She heard Dixon tell Hoyt and Nooks to leave. Lane also heard Nooks threaten to "knock out" her and Dixon. Lane testified that Nooks then rushed toward them and made a motion like he was going to throw a punch. At that point, Lane heard a "phoom" sound when Dixon shot Nooks.

{¶ 13} On cross-examination, Lane acknowledged telling police that she and Hoyt did not exchange words on the street prior to the shooting. Lane also did not mention anything to police about Hoyt's throwing a bottle. Contrary to her trial testimony, Lane told police that she had tried to restrain Dixon from confronting Hoyt and Nooks, not that Dixon had tried to restrain her. Lane also did not tell police that Hoyt and Nooks had been making threats to her. In fact, Lane told police that all Nooks said to her outside the house was "what's up?" Lane additionally told police that she then went back inside her house and stayed there and that she did not know who had been shot.

{¶ 14} Both parties also presented expert testimony regarding the medical care Nooks received after the shooting. The coroner's office identified his cause of death as "complications of quadriplegia due to gunshot wound of the neck," and the manner of death was identified as homicide. The record reflects that Nooks spent approximately one week at a long-term care facility prior to his death. Prosecution witness Dr. Kevin Sharrett reviewed Nooks' records and opined that the care he received was appropriate and that the complications leading to his death—namely, "mucus plugging and increased secretions, and the pneumonia, and the decubitus, and the sepsis, and all of the organ failure that goes along with that"—were to be expected of a person who had sustained

his type of injury. In Dr. Sharrett's opinion, the treatment Nooks received was consistent with the standard of care given in Ohio nursing facilities.

{¶ 15} The defense presented competing testimony from Dr. Susan Groah. In her testimony, Dr. Groah opined that Nooks' condition required respiratory therapy, which he did not receive at the long-term care facility. Dr. Groah stated that the care Nooks received did not meet the standard of care for a patient with his injury in his condition. As a result of that substandard care, Dr. Groah opined that Nooks' death was caused by "mucus plugging in the lung." On cross-examination, Dr. Groah agreed that Nooks received "some treatment" or at least "a very low level of pulmonary treatment" that was lower than the standard of care. She also agreed that Nooks received nebulized medicine at the long-term care facility and that the facility provided for the suctioning of his lungs.

{¶ 16} The State called Dr. James Pearle as a rebuttal witness. Dr. Pearle noted that Nooks' weight had dropped from 190 pounds to 120 pounds, that his health had been in steady decline prior to his arrival at the last facility, and that he had been suffering from several chronic diseases as a result of his injury. Dr. Pearle opined that additional respiratory therapy probably would not have helped him. In Dr. Pearle's opinion, Nooks' death was not caused in any way by the level of care he received.

{¶ 17} Based on the evidence presented, the jury found Dixon guilty of murder and felonious assault with accompanying firearm specifications. The trial court merged the two offenses and the specifications as allied offenses of similar import. The State elected to proceed with sentencing for murder. The trial court imposed a sentence of 15 years to life in prison for murder with a consecutive prison term for the firearm specification. This

appeal followed.

## II. Analysis of Jury Instructions

{¶ 18} Dixon's first three assignments of error are as follows:

1. THE COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON INFERIOR DEGREE OFFENSES.

2. THE COURT ERRED IN FAILING TO ISSUE A JURY INSTRUCTION WITH A CORRECT AND COMPLETE STATEMENT OF LAW.

3. THE COURT ERRED IN PROHIBITING THE RETROACTIVE APPLICATION OF THE OHIO STAND YOUR GROUND LAW.

{¶ 19} These assignments of error implicate the trial court's jury instructions. Where the issue was raised at trial, we review the denial of a jury instruction for an abuse of discretion. *State v. Taylor*, 2d Dist. Montgomery No. 28668, 2020-Ohio-6854, ¶ 10, citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989).

{¶ 20} With regard to the first assignment of error, Dixon sought to have the jury instructed on aggravated assault as an inferior-degree offense to felonious assault and on voluntary manslaughter as an inferior-degree offense to murder. In deciding whether to provide a lesser-included or inferior-offense instruction, a trial court must find sufficient evidence to allow a jury to reasonably reject the greater offense and to find a defendant guilty on a lesser-included or inferior-degree offense. *State v. Ferrell*, 2020-Ohio-6879, 165 N.E.3d 743, ¶ 35 (10th Dist.). When the evidence pertaining to a lesser-included offense or inferior-degree offense meets this test, a trial court must instruct the jury on the lesser-included or inferior-degree offense. *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d

775, ¶ 32 (2d Dist.).

{¶ 21} We have recognized that aggravated assault is an inferior-degree offense to felonious assault and that voluntary manslaughter is an inferior-degree offense to murder. This is so because aggravated assault and voluntary manslaughter both contain an additional mitigating element of "serious provocation." *State v. Rider*, 2d Dist. Champaign No. 2021-CA-12, 2022-Ohio-1964, ¶ 39-40. In other words, the greater-degree and inferior-degree offenses are similar except aggravated assault and voluntary manslaughter require proof that a defendant acted under the influence of sudden passion or in a fit of rage brought about by serious provocation. *State v. Miller*, 2d Dist. Montgomery No. 29099, 2022-Ohio-213, ¶ 16; *State v. Robinson*, 2d Dist. Clark No. 2021-CA-3, 2021-Ohio-3255, ¶ 11. The test for whether a serious provocation occurred and whether a defendant acted under the influence of sudden passion or in a fit of rage includes objective and subjective components. *Robinson* at ¶ 12. The provocation must be sufficient to arouse an ordinary person beyond the power of his control, and the defendant in fact must have acted under the influence of sudden passion or in a fit of rage. *Id.*

{¶ 22} This court has recognized that a self-defense argument generally is inconsistent with a serious-provocation theory. *State v. Brown*, 2d Dist. Montgomery No. 27738, 2018-Ohio-3068, ¶ 47 (citing cases). For that reason, self-defense and aggravated-assault or voluntary-manslaughter instructions are incompatible in most cases. *Id.* Nevertheless, we recognized in *Brown* that the two theories conceivably might be compatible where a defendant is found to have exceeded the degree of force

necessary to defend himself because he acted out of passion or rage.

{¶ 23} In the present case, we are unpersuaded that Nooks engaged in any serious provocation. Even accepting Dixon's testimony as true, Nooks did not assault her in the bar parking lot. He also did not throw the bottle at her. According to Dixon, he simply "lunged" toward her outside of Lane's house. Even if we were to accept that this conduct qualified as serious provocation, Dixon's own testimony establishes that she did not act out of sudden passion or in a fit of rage. Dixon testified that she fired the handgun because she was scared, worried, and afraid of being assaulted by Hoyt and Nooks. But " '[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage.' " *Miller* at ¶ 18, quoting *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998). Absent evidence that Dixon acted under the influence of sudden passion or in a fit of rage caused by serious provocation, the trial court did not abuse its discretion in refusing to instruct the jury on aggravated assault or voluntary manslaughter. The first assignment of error is overruled.

{¶ 24} In her second assignment of error, Dixon contends the trial court erred in failing to give a "correct and complete" jury instruction on intervening cause. This argument concerns an instruction the trial court gave about Nooks' medical care being an intervening cause of his death.

{¶ 25} Over the State's objection, the trial court instructed the jury that gross negligence by medical personnel may be an independent intervening cause of a patient's death, thereby breaking the causal connection between the defendant's conduct and the death and precluding a finding of guilt. The instruction included a definition of gross

negligence.

{¶ 26} On appeal, Dixon claims the trial court erred in failing to include willful maltreatment by medical personnel as an independent intervening cause of a patient's death. She argues that a qualified intervening cause can be gross negligence or willful maltreatment and that a finding of either one is sufficient to support a not-guilty verdict. Dixon asserts that the absence of an instruction on willful maltreatment left the jury only partially informed about how to evaluate the staff's actions at the long-term care facility where Nooks died.

{¶ 27} Upon review, we find Dixon's argument to be unpersuasive. It is true that either gross negligence or willful maltreatment by medical personnel may relieve a defendant of liability for a victim's death. *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 687, ¶ 45. In the present case, however, it appears that Dixon requested the instruction the trial court gave over the State's objection. She cannot reasonably complain on appeal about an instruction she sought and obtained. Regardless, we see no error in the trial court's omitting a reference to willful maltreatment. The trial court reasonably could have concluded that the evidence did not support that branch of the intervening-cause instruction. We see no evidence to support a finding that staff members at the long-term care facility engaged in willful maltreatment of Nooks. At best, Dixon's evidence supported a gross-negligence theory. Absent evidence of willful maltreatment, the trial court was not obligated to instruct the jury on that issue. The second assignment of error is overruled.

{¶ 28} In her third assignment of error, Dixon contends the trial court erred in

denying her request to apply Ohio's recently-enacted stand-your-ground law. Effective April 6, 2021, while Dixon's case was pending, R.C. 2901.09(B) was amended and a new division (C) was added to the statute. The effect of the changes was to expand the locations from which a person claiming self-defense has no duty to retreat. As so modified, the legislation now states:

> (B) For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be.

> (C) A trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense, defense of another, or defense of that person's residence reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety.

R.C. 2901.09(B) and (C).

{¶ 29} The change to R.C. 2901.09(B) eliminates the duty to retreat whenever a person is anywhere he has a right to be, not just when a person is in his own or a family member's residence or vehicle. The new division (C) identifies circumstances under which a trier of fact shall not consider the possibility of retreat. Collectively, these provisions have been referred to as the stand-your-ground law.

{¶ 30} Contrary to Dixon's argument on appeal, the trial court did not refuse to apply the stand-your-ground law to her case. In the proceedings below, the parties explicitly agreed to apply the law on self-defense, including the duty to retreat, as it existed

in May 2018 before R.C. 2901.09 was amended. Tr. Vol. IV at 887-888; Tr. Vol. V at 1054-1055. Dixon did purport to preserve the issue of retroactive application of the stand-your-ground law for appeal. Tr. Vol. IV at 887-888. But the trial court never actually made a retroactivity ruling because the parties' agreed the stand-your-ground law did not apply in Dixon's case.

{¶ 31} In any event, we see no error, plain or otherwise, in the trial court's failure to instruct the jury consistent with the changes made by the stand-your-ground law. In *State v. Degahson*, 2d Dist. Clark No. 2021-CA-35, 2022-Ohio-2972, this court recently held that the stand-your-ground law's changes to R.C. 2901.09 do not apply retroactively to a defendant who committed her offenses prior to April 6, 2021 and who was tried after that date. In *Degahson*, we concluded that such a defendant is not entitled to a stand-your-ground jury instruction. *Id.* at ¶ 16-24. We reasoned that the amended language of R.C. 2901.09 was not made retroactive. *Id.* at ¶ 17. We further reasoned that it could not be made retroactive because it is substantive in nature. *Id.* at ¶ 18-20. Finally, we determined that R.C. 1.58 compelled application of the former version of R.C. 2901.09. *Id.* at ¶ 22. Based on *Degahson*, we conclude that the trial court did not err in failing to apply the stand-your-ground law in Dixon's case. The third assignment of error is overruled.

### III. Legal Sufficiency and Manifest Weight of the Evidence

{¶ 32} Dixon's fourth and fifth assignments of error state:

4. APPELLANT'S CONVICTION WAS BASED ON INSUFFICIENT EVIDENCE AS A MATTER OF LAW.

5. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT
OF THE EVIDENCE.

{¶ 33} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 34} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 35} With the foregoing standards in mind, we conclude that Dixon's murder and felonious-assault convictions were based on legally sufficient evidence and were not against the weight of the evidence.

{¶ 36} Dixon argues that the jury's guilty verdicts were unsupported because she acted in self-defense and because gross negligence and willful maltreatment by the staff at Nooks' long-term care facility acted as an independent intervening cause of his death.

{¶ 37} With regard to self-defense, the parties agreed that the trial court would instruct the jury consistent with the law in effect at the time of Dixon's offenses in May 2018. At that time, self-defense was an affirmative defense requiring a defendant to prove " '(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *State v. Goff*, 128 Ohio St. 3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 36, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997).[2]

{¶ 38} Based on the evidence presented, we believe the jury reasonably could

---

[2] After Dixon's offenses but prior to her trial, R.C. 2901.05 was amended effective March 28, 2019 to place the burden of proof on the State to disprove a self-defense claim. At the time of Dixon's July 2021 trial, the law in this appellate district was that the burden-allocating change in R.C. 2901.05 did not apply to a defendant like Dixon whose offenses pre-dated March 28, 2019. *See State v. Irvin*, 2020-Ohio-4847, 160 N.E.3d 388, ¶17-27 (2d Dist.). In *State v. Brooks*, Ohio Slip Opinion No. 2022-Ohio-2478, __ N.E.3d __, however, the Ohio Supreme Court recently held that the burden-allocating change in the self-defense statute does apply to trials occurring on or after March 28, 2019 even if the alleged offenses occurred prior to that date. In the proceedings below, Dixon purported to preserve for appeal the issue of whether Ohio's new stand-your-ground law should have retroactive application. Trial Tr. Vol. IV at 887-888. She made no argument, however, regarding whether the amendment to R.C. 2901.05 placing the self-defense burden of proof on the State should apply to her. Moreover, Dixon has not raised on appeal the trial court's jury instruction that she bore the burden to prove self-defense by a preponderance of the evidence. In fact, Dixon's appellate brief cites case law placing the burden of proof on her to prove the elements of her self-defense claim. Appellant's Brief at 31. Therefore, we have no occasion to address whether Dixon was entitled to have the burden of proof placed on the State as the issue has not been raised.

have rejected Dixon's self-defense claim. The State's evidence established that she shot Nooks, who was unarmed, as he walked toward Lane's house. Before doing so, Dixon went to a friend's car and retrieved a handgun. She then approached Hoyt and Nooks with the gun and displayed it to scare them. Dixon proceeded to raise the weapon and shoot Nooks in the neck. He fell to the ground in the street, and shell casings were found in Lane's front yard. This fact undermines Dixon's claim that Nooks was close enough to "lunge" for her or her weapon.

{¶ 39} Dixon's argument about gross negligence or willful maltreatment by the staff at the long-term care facility is equally unpersuasive. The trial court correctly did not instruct the jury about willful maltreatment because there was no evidence to support such an instruction. With regard to gross negligence, the jury reasonably could have rejected Dixon's argument based on the testimony of prosecution witnesses Dr. Sharrett and Dr. Pearle. As set forth above, Dr. Sharrett opined that the treatment Nooks received was consistent with the standard of care given in Ohio nursing facilities. For his part, Dr. Pearle opined that additional respiratory therapy probably would not have helped Nooks and that Nooks' death was not caused in any way by the level of care he received. Although Dixon presented competing testimony from Dr. Groah, the jury was free to weigh the evidence, evaluate witness credibility, and reject Dixon's argument.

{¶ 40} Viewing the evidence in a light most favorable to the prosecution, we believe a rational trier of fact could have found the essential elements of Dixon's offenses proven beyond a reasonable doubt. We also are unpersuaded that the jury clearly lost its way and created a manifest miscarriage of justice. This is not an exceptional case in which

the evidence weighed heavily against the convictions. Accordingly, Dixon's fourth and fifth assignments of error are overruled.

## IV. Conclusion

{¶ 41} The judgment of the Greene County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and LEWIS, J., concur.

Copies sent to:

Megan A. Hammond
L. Patrick Mulligan
Frank Mathew Batz
Hon. Michael A. Buckwalter